Commonwealth vs. Daniel J. Despres.

No. 06-P-1252.

Middlesex. September 7, 2007. - November 5, 2007.

Present: Cypher, Kantrowitz, & Cohen, JJ.

*Indecent Assault and Battery. Evidence,* Exculpatory, Opinion, Impeachment of credibility, Reputation. *Witness,* Credibility, Impeachment. *Mental Impairment.*

A trial court judge properly denied a criminal defendant's motion for a new trial based on newly discovered evidence, brought after the defendant was convicted of indecent assault and battery on a person over the age of fourteen years upon proof that the defendant had fondled the genitals of a twenty-one year old mildly retarded acquaintance, where the two proffered witnesses did not qualify as experts who could opine as to the nature of the victim's condition and its relationship to his ability to perceive, remember, and articulate events; where the witnesses could not offer their lay opinions, as they did not have the intimate and lengthy experience caring for the victim that might have allowed them to explain how the victim was affected by his condition; and where the evidence did not constitute admissible reputation evidence, because the witnesses did not have personal knowledge of the victim's general reputation for veracity in the community, as disclosed by the common speech of his neighbors and members of the community. [649-652]

Complaint received and sworn to in the Concord Division of the District Court Department on July 22, 1994.

After review by this court, 44 Mass. App. Ct. 1116 (1998), and 54 Mass. App. Ct. 1104 (2002), a motion for a new trial, filed on March 7, 2006, was considered by *Paul L. McGill,* J.

*David Shapiro* for the defendant.

*Fawn D. Balliro,* Assistant District Attorney, for the Commonwealth.

Cohen, J. In 1995, the defendant was convicted of indecent assault and battery on a person over the age of fourteen years, in violation of G. L. c. 265, § 13H. His conviction was based

upon proof that, on the night of July 1, 1994, he fondled the genitals of a twenty-one year old mildly retarded acquaintance.

The present appeal, from the trial judge's denial of the defendant's motion for a new trial based on newly discovered evidence, brings this case to us for the third time. On two previous occasions, in unpublished memoranda and orders issued pursuant to our rule 1:28, we remanded the case to the District Court: first, to permit the defendant to discover documents relating to the victim's mental impairment, including records of the Department of Mental Retardation (DMR), *Commonwealth v. Despres*, 44 Mass. App. Ct. 1116 (1998); and, second, to obtain discovery regarding an anonymous entry in the DMR records indicating that the victim had made unreliable reports about being mistreated or having his rights violated at the respite facility where he sometimes resided, *Commonwealth v. Despres*, 54 Mass. App. Ct. 1104 (2002).

We now conclude that the defendant has had ample opportunity to develop admissible evidence calling into question the justice of his conviction, but that he has failed to do so. We therefore affirm the judge's order denying the defendant's motion for a new trial.

*The trial evidence.* To place the newly discovered evidence in context, we begin by summarizing the evidence at trial. The Commonwealth's case was built upon the testimony of four witnesses: the victim, the victim's father's girlfriend (who testified as a fresh complaint witness), the investigating police officer (who testified both to the victim's fresh complaint and to statements made by the defendant when interviewed), and the victim's DMR crisis counsellor (who had worked with the victim for some time, and who visited with him on the day after the incident).

The victim was described by his counsellor as having cognitive limitations — "mostly" having "trouble comprehending verbal speech." At the time of the incident, he was twenty-one years old, living at home in Waltham with his father and brother, and working twenty hours per week at a gasoline station, where he stocked supplies, cleaned the bathroom, and performed yard work. The defendant and the victim had been acquainted for two years and often talked to each other over citizen's band

(CB) radio. The defendant was known to the victim by the CB radio name "Porky" and had assisted the victim in obtaining his learner's permit to drive.

On July 1, 1994, the defendant drove into the gasoline station where the victim worked and invited the victim to come with him to watch fireworks in Boston. The victim agreed and, after finishing work, rode his bicycle home as the defendant followed. The victim got into the front passenger seat of the defendant's vehicle, whereupon the defendant made a telephone call and told the victim that there were no fireworks to be seen. The defendant then drove toward Concord, and began talking to the victim about "girls" and "blow jobs." As he chatted, he reached over, slid his hand inside the victim's pants, and began to fondle the victim's penis. The victim asked the defendant to stop, but the defendant continued to touch him as he drove.

An interlude ensued in which the defendant picked up a friend, John Anderson, stopped for food and coffee, drove to Framingham to visit another friend at his place of work as a security guard, and took Anderson home. When the defendant and the victim again were alone, the defendant drove to a reservoir area, even though the victim asked to go home. The defendant had the victim hold a flashlight and look at a magazine containing pictures of naked women. He asked the victim if he had a "hard on," and again touched the victim's penis, this time over his clothing, before finally taking him home.

That night, the victim could not sleep because he was scared and shaking. In the morning he told his father's girlfriend, and then his father, what happened. He later met with his crisis clinician, who had never seen him so upset. Additionally, he was interviewed by a police officer. The same police officer spoke with the defendant a few days after the incident. According to the officer, the defendant confirmed that he had driven around with the victim but denied touching him. The officer also testified, without objection from the defendant, that when interviewed, the defendant made some additional comments, including, "I know a couple of kids who are gay if I wanted sex with a male," and, "They joke [on the CB] about me being a child molester. I told them that's bullshit. Come up with the evidence. Bring it to my attention and we'll go from there."

The defendant's case consisted of the testimony of John Anderson and the defendant. Anderson's description of the events that occurred in his presence was essentially consistent with the victim's testimony. In addition, Anderson testified that, at one point, he saw the defendant briefly touch the victim's thigh to get his attention and that the victim seemed nervous. He also testified that he saw the victim fumble underneath the seat of the car and retrieve a magazine with pictures of naked women in it.

The defendant recounted how he drove around with the victim, picked up Anderson, stopped for food and coffee, went to Framingham to see his other friend, and took Anderson, and later the victim, to their respective homes. He acknowledged that he had a magazine in his car that contained pictures of naked women, stating that he may have purchased it and put it under the seat and forgotten about it. He also admitted that the investigating officer's testimony about their conversation was accurate — that he told the officer that he knew where to find "gay kids" to have sex with if he were so inclined and that there had been jokes about him being a "child molester." He volunteered further, on direct examination, that he used to drive a school bus, but lost his job because someone had alleged that he was a child molester. However, he denied ever molesting a child or touching the victim inappropriately.

*The newly discovered evidence.* After concluding discovery concerning the entry in the DMR records indicating that the victim had made unreliable reports about being mistreated or having his rights violated at the respite facility, the defendant filed a motion for a new trial, supported by two new pieces of evidence: (1) deposition testimony given by Brenda Castrichini, formerly a crisis clinician at the respite facility, and (2) an affidavit given by Amy Wally, the respite facility's former assistant director. Neither one of these witnesses authored the record in question, and neither was the victim's primary clinician.

Castrichini, who has a bachelor's degree in human services and has been trained to work with people with mental illnesses, testified that the victim was a "frequent client" of the respite facility and began living there full time the "last year" before she left her job there. She stated that she interacted with him

regularly, and that he was "very juvenile," misinterpreted events, made false complaints, and "told a lot of stories for attention or whatever his reason was." She was of the opinion that the victim had a "character disorder," and believed that his unreliable reporting was related to his "character," "mental illness," and "incapacities."

Wally, who has a degree in psychology, averred that the victim was "diagnosed with mental retardation and behavioral issues," and that his "diagnosis led him to have a significant tendency to misperceive events, exaggerate and fabricate about events in order to draw attention to himself." She stated further that she "had to frequently question the reliability of his complaints and the accuracy of his interpretation of events."

The witnesses spoke primarily in general terms, but offered as examples of the victim's unreliability his complaints that staff were rough with him while restraining or attempting to move him. Neither witness indicated that the victim ever made a false complaint of sexual abuse similar to the complaint at issue in this case.[1]

In his motion for a new trial, the defendant claimed that the Castrichini deposition and Wally affidavit substantially undermined the credibility of the victim, and had this evidence been heard by the jury, it may well have affected the outcome of his trial. The motion judge denied the defendant's motion, concluding that the defendant had submitted "no new *admissible trial* evidence which would go to credibility."[2]

*Discussion.* We review the denial of a motion for a new trial

---

[1]That being so, no issue is raised as to the admissibility of the proffered evidence under the rubric of *Commonwealth* v. *Bohannon*, 376 Mass. 90, 95 (1978), *S.C.*, 385 Mass. 733 (1982).

[2]In his endorsement on the motion, the judge also adopted the reasons stated in a particular portion of the Commonwealth's opposition, namely that the witnesses were not qualified to render their opinions and therefore could not testify to them at trial; the witnesses could not testify about prior instances of lying without running afoul of the prohibition on character evidence; neither witness's testimony constituted admissible reputation evidence; none of the supposed false allegations made by the victim involved the same type of crime at issue in the case; and, because the victim's testimony at trial was coherent and substantially corroborated by other testimony, it could not reasonably be concluded that his mental condition had an adverse impact on his ability to perceive, remember, and correctly articulate the events upon which the charges were brought.

"only to determine whether there has been a significant error of law or other abuse of discretion." *Commonwealth* v. *Acevedo*, 446 Mass. 435, 441 (2006), quoting from *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986). Where a defendant has been denied access to potentially exculpatory mental health records prior to trial, a motion for a new trial based on materials found in or as a result of receiving those records is treated as a motion for a new trial based on newly discovered evidence. See *Commonwealth* v. *Figueroa*, 422 Mass. 72, 78-79 (1996) (*Figueroa II*). It is the defendant's burden to establish that the evidence is admissible and that there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial. *Commonwealth* v. *Weichell*, 446 Mass. 785, 798-799 (2006). See *Figueroa II*, *supra* at 77.

"[W]here the complaining witness is suffering from mental impairment, . . . evidence of how that impairment might affect [his] capacity to perceive, remember and articulate the alleged events . . . can be used to impeach [his] credibility." *Commonwealth* v. *Figueroa*, 413 Mass. 193, 203 (1992) (*Figueroa I*). However, the proponent of evidence related to mental impairment has the burden of showing that the judge committed an abuse of discretion in excluding it. *Commonwealth* v. *Carrion*, 407 Mass. 263, 274 (1990). It is the specific and inescapable relationship between an individual's organic condition and the traits in question that differentiates evidence related to mental impairment from inadmissible evidence of character; character evidence, as such, is no more admissible with respect to those with mental disabilities than with respect to anyone else. See *Commonwealth* v. *Bonds*, 445 Mass. 821, 829-831 (2006).

The introduction of evidence concerning the personality characteristics of a witness with a mental impairment, without establishing that the trait at issue is an immutable outgrowth of his or her organic condition, risks not only that a jury might return a verdict improperly out of sympathy or dislike for the witness, but also that a jury might conclude erroneously that the witness "acted in a particular way simply because his *character* suggests that he would" (emphasis supplied). *Id.* at 829 & n.12. If used to suggest that a mentally impaired witness is inherently untruthful, character evidence is particularly troubling. It is well

recognized that some people with mental disabilities may be especially vulnerable to physical and sexual abuse by virtue of their reliance upon others to meet their daily needs.[3] Their reports of abuse should not be discounted merely because they have a mental disability unconnected to their capacity to perceive, remember, and articulate events.

In the present case, it was within the judge's discretion to determine that the proffered evidence was not admissible, because neither Castrichini nor Wally was qualified to render her opinion. To the extent that they were proposed as expert witnesses, "the question of an expert's qualifications is for the trial judge, and his determination will be reversed only on an abuse of discretion or error as matter of law." *Commonwealth* v. *Ruiz*, 442 Mass. 826, 833 (2004), quoting from *Commonwealth* v. *Boyd*, 367 Mass. 169, 182 (1975). Here, the judge was within his discretion in concluding that the witnesses' qualifications were inadequate, inasmuch as they both lacked advanced degrees in psychology or psychiatry and reasonably could be viewed as having insufficient skills, knowledge, or experience to opine as to the nature of the victim's condition and its relationship to his ability to perceive, remember, and articulate events. See *Commonwealth* v. *Boyd*, *supra* at 182-183.

To the extent that the evidence supplied by Castrichini and Wally was offered as lay opinion, it also was well within the discretion of the judge to reject it, as neither of these witnesses had the type of intimate and lengthy experience caring for the victim that might have allowed them to explain how the victim was affected by his condition. See *Commonwealth* v. *Bonds*, *supra* at 830 n.14. See also, as to lay opinion generally, *Commonwealth* v. *Smith*, 17 Mass. App. Ct. 918, 920-921 (1983). Neither Castrichini nor Wally was the victim's primary care-

---

[3]This recognition is reflected, for example, in G. L. c. 265, § 13F (assault and battery or indecent assault and battery on a mentally retarded person); G. L. c. 265, § 13K (assault and battery upon an elderly or disabled person); G. L. c. 19C, § 10 (requiring mandated reporters to notify the disabled persons protection commission when a disabled person has suffered a serious mental or physical injury as a result of abuse, including unconsented-to sexual activity); *Cooney* v. *Department of Mental Retardation*, 52 Mass. App. Ct. 378, 382 (2001) (noting that purpose of mandated reporter statute is to protect "those who are vulnerable and at risk").

taker, and the nature, quality, and duration of their interactions with him were not shown to be especially deep or extensive. By way of contrast, in *Commonwealth* v. *Bonds, supra* at 830, lay opinion as to a particular manifestation of an individual's mental impairment — being overly trusting — was received from that individual's mother, with whom she had lived her entire life. Even so, it was recognized in the *Bonds* case that a medical expert might have been useful, although not necessary on the particular facts of that case. *Id.* at 830 n.14.

Nor was the newly discovered evidence admissible to impeach the victim's character for truthfulness. "Such impeachment can properly come only in the form of evidence of a witness's general reputation for truth and veracity, or by evidence of a witness's prior criminal convictions." *Commonwealth* v. *Daley,* 439 Mass. 558, 563 (2003). The evidence proffered in support of the defendant's motion for a new trial did not establish that either Castrichini or Wally had "personal knowledge of the [victim]'s general reputation for veracity in the community," *Commonwealth* v. *Favorito,* 9 Mass. App. Ct. 138, 140 (1980), "as disclosed by the common speech of [his] neighbors and members of the community," *Commonwealth* v. *Dockham,* 405 Mass. 618, 631 (1989), quoting from *Commonwealth* v. *Baxter,* 267 Mass. 591, 593 (1929). Accordingly, it did not constitute admissible reputation evidence.

*Conclusion.* In the end, the judge, who had presided over the trial, was entitled to conclude that, despite having been given ample opportunity to develop new admissible evidence to impeach the victim, the defendant made an inadequate showing in support of his motion for a new trial. The defendant was required to "do more than allege that at a new trial he might be able to call a witness who might be able to offer relevant, admissible evidence." *Figueroa II,* 422 Mass. at 77.

> *Order denying motion for a new*
> *trial affirmed.*